John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel.: (858) 209-6941
jnelson@milberg.com

*Counsel for Plaintiff and the Prospective Class*

*[Additional counsel in signature block]*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| **LORIANN EICHENBERGER, Individually, and on behalf of the NORTHBAY HEALTHCARE 403(B) RETIREMENT PLAN, and on behalf of all the similarly situated participants and beneficiaries of the plan**,<br><br>Plaintiffs,<br><br>v.<br><br>**NORTHBAY HEALTHCARE CORPORATION; THE NORTHBAY HEALTHCARE RETIREMENT PLAN COMMITTEE; SAGEVIEW ADVISORY GROUP; and John and Jane Does 1-30 in their capacities as fiduciaries**,<br><br>Defendants. | No. |

**CLASS ACTION COMPLAINT**

Plaintiff Loriann Eichenberger ("Plaintiff"), individually, and as a representative of a class of similarly situated participants and beneficiaries of the NorthBay Healthcare 403(b) Retirement Plan (the "Plan") brings this Class Action Complaint ("Complaint") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (3) & 1109(a),

against NorthBay Healthcare Corporation ("NorthBay Healthcare"), the NorthBay Healthcare Retirement Plan Committee (the "Committee"), SageView Advisory Group ("SageView"), and John and Jane Does 1-30 (collectively, "Defendants") for breaching their fiduciary duties in the management, operation, and administration of the Plan.

## I. INTRODUCTION

1. Defendants breached their fiduciary duties in two ways. *First*, Defendants consistently retained the T. Rowe Price Growth Stock Fund Class I (hereafter the "TRP Growth Stock Fund") throughout the Class Period[1], despite this fund having proven that it could not beat its own chosen index benchmark, while it simultaneously underperformed its peers under nearly all Modern Portfolio Theory ("MPT") investment metrics and, consequently, in terms of returns, thus violating a basic investment principle of providing no expectation of additional returns in exchange for increased risk. *Second*, Defendants failed to monitor the Plan's recordkeeping and administrative ("RKA") expenses. Lincoln, the Plan's recordkeeper and a party in interest, collected $122 to $212 per participant per year—two to three times what comparable plans paid for the same commodity. Comparable plans with similar participant counts paid $47 to $66 per participant during the same period.

2. ERISA requires fiduciaries to act "solely in the interest of the participants and beneficiaries" and with the "care, skill, prudence, and diligence" that a prudent person would use. ERISA § 404(a)(1); 29 U.S.C. § 1104(a)(1). Defendants failed to meet this standard. They failed to conduct a reasonably prudent process to investigate and monitor investment options within the Plan and remove the unsuitable and underperforming investment in the TRP Growth Stock Fund. They never properly benchmarked the Plan's recordkeeping fees. The excessive cost of the fees bore no rational relationship to the actual cost of services rendered and was inconsistent with Defendants' obligation to ensure that Plan expenses were reasonable.

[1] Under ERISA, claims for breach of fiduciary duty may be brought for "(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation . . . ." 29 U.S.C. § 1113. Accordingly, the "Class Period" begins on August 4, 2020, and continues through the date of judgment.

3. The cost of Defendants' failures is $11 million to $31 million in performance loss damages over the Class Period (August 4, 2020, through the date of judgment) and $2.3 million in excess recordkeeping fees over the Class Period. Plaintiff brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to recover these losses and obtain appropriate equitable relief.

## II. JURISDICTION AND VENUE

4. This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

5. 29 U.S.C. § 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan.

6. This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b), because it is the District in which the Plan was administered, where at least one of the alleged breaches took place, and where at least one Defendant may be found.

7. This Court has personal jurisdiction over each Defendant because each Defendant either resides in this District, transacts business in this District, or has sufficient minimum contacts with the forum.

## III. THE PLAN AND THE PARTIES

### A. The Plan

8. The Plan, established on January 1, 1989, is a 403(b) defined contribution, individual account, employee benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34). The Plan covers substantially all employees of NorthBay Healthcare who have met the age and service requirements. The Plan was amended and restated effective June 26, 2023, and January 1, 2024.

9. In a defined contribution plan, each participant has an individual account. Participants' retirement benefits are limited to the value of their accounts, determined solely by contributions plus investment gains, less fees and expenses. *See* 29 U.S.C. § 1002(34). Each dollar wasted on excessive fees or lost to below-market returns is one less dollar available for retirement.[2]

---

[2]*See* U.S. Dep't. of Labor, Emp. Benefits Sec. Admin., "A Look at 401(k) Plan Fees," 1–2 (September 2019),

10. The Plan is one of the largest retirement plans in the country. As of December 31, 2024, the Plan held more than $500 million in assets and had 3,587 participants with account balances.[3] The Plan's size and demographics during the Class Period are set forth in Table 1:

**Table 1: Plan Demographics**[4]

| Year | Participants | Participant Rank | Assets | Asset Rank |
|---|---|---|---|---|
| 2019 | 3,479 | 99.53% | $377,043,134 | 99.64% |
| 2020 | 3,463 | 99.53% | $430,022,410 | 99.64% |
| 2021 | 3,428 | 99.53% | $494,581,190 | 99.66% |
| 2022 | 3,694 | 99.56% | $404,254,149 | 99.66% |
| 2023 | 3,530 | 99.56% | $454,474,215 | 99.67% |
| 2024 | 3,587 | 99.57% | $500,754,951 | 99.67% |
| **Average** | **3,530** | **99.55%** | **$443,521,675** | **99.66%** |

11. At all relevant times, the Plan has been larger than at least 99.64% of all retirement plans by both participants and assets.

**B. Plaintiff**

12. Plaintiff Loriann Eichenberger resides in Collinsville, Texas. During the Class Period, Plaintiff was a participant in the Plan under 29 U.S.C. § 1002(7). Throughout her participation, Plaintiff was invested in the TRP Growth Stock Fund and paid the recordkeeping and administrative costs associated with the Plan. Plaintiff suffered economic losses as a direct result of the conduct alleged herein.

**C. Defendants**

13. Defendant NorthBay Healthcare Corporation is a healthcare system headquartered in Fairfield, California, that operates hospitals and related medical facilities in Solano County and nearby areas.

14. At all relevant times, NorthBay Healthcare was the sponsor and administrator of the Plan within the meaning of 29 U.S.C. § 1002(16)(A).[5] NorthBay Healthcare exercises ultimate

---

https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[3] All data sourced from the Plan's Form 5500s filed with the Department of Labor and publicly available through the DOL's website at https://www.efast.dol.gov/5500Search/.

[4] All data sourced from the Plan's Form 5500s filed by Defendants with the Department of Labor, Line 6g / 6g(2) (participants) and Schedule H, Line 11 (net assets) and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/ and other publicly available information about the Plan.

[5] *See* 2024 Form 5500, Part II.

discretionary authority and control with respect to the management and administration of the Plan, including appointing members of the Committee and determining the scope of their fiduciary authority.

15. Per the Plan's Investment Policy Statement (the "IPS"), NorthBay Healthcare appoints the members of the Committee as well as the Plan's Trustee, Recordkeeper, and Investment Manager. IPS at 2.

16. Under ERISA, a fiduciary with the power to appoint committee members has a concomitant duty to monitor and supervise those appointees.

17. Defendant NorthBay Healthcare Retirement Plan Committee (the "Committee") is the named fiduciary responsible for "supervising the investment of Plan assets and making decisions concerning investment alternatives available under the Plan." IPS at 2.

18. At all relevant times, the Doe Defendants, as members of the Committee, were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan and/or control of Plan assets.

19. The IPS provides: "The Committee has elected to delegate [their investment] duties by selecting an Investment Manager under ERISA 3(38)" while retaining responsibility "for the oversight and evaluation of the Investment Manager." *Id.*

20. Defendant SageView Advisory Group ("SageView") is the Plan's "Investment Manager (within the meaning of Section 3(38) of [ERISA])" and, in that role, is "responsible for the Plan-level investment selection process." *Id.* SageView is therefore a fiduciary of the Plan. 29 U.S.C. § 1002(38); *see Lauderdale v. NFP Ret., Inc.*, No. SACV21301JVSKESX, 2021 WL 3828646, at *3 (C.D. Cal. Aug. 18, 2021) ("investment managers are, by definition, fiduciaries of the Plan and therefore subject to the obligations attendant to their fiduciary duties, such as the requirement to conduct an independent investigation where a possible course of action can lead to questions as to the fiduciary's loyalty").

21. Based on Form 5500 filings, the Plan engaged SageView to serve as Investment Manager in 2024.[6]

22. At all relevant times, each Defendant was one or more of the following: (a) a party in interest under 29 U.S.C. § 1002(14); (b) a Plan fiduciary under 29 U.S.C. § 1002(21)(A); and/or (c) a named fiduciary under the Plan.

**D. Parties in Interest**

23. At all relevant times, non-party Lincoln Financial Group Trust Company ("Lincoln Trust Company") has been the Trustee of the Plan and non-party Lincoln Financial Group ("Lincoln Financial") has provided recordkeeping and administrative services to the Plan (collectively, both Lincoln entities will be referred to as "Lincoln").

24. Lincoln is a party in interest with respect to the Plan because: (a) Lincoln Trust Company was and is a fiduciary to the Plan in its role as Trustee; and (b) Lincoln Financial was and is a service provider to the Plan. 29 U.S.C. § 1002(14).

## IV. <u>ERISA'S FIDUCIARY DUTIES</u>

25. ERISA imposes strict fiduciary duties upon fiduciaries of retirement plans. A fiduciary must:

> discharge his duties … *solely* in the interest of the participants and beneficiaries and (A) for the *exclusive* purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ….

ERISA § 404(a)(1); 29 U.S.C. § 1104(a)(1) (Emphasis added). These duties are the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)).

26. ERISA's fiduciary duties build on the common law of trusts. "Rather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the

---

[6] *See* 2023 Form 5500, Schedule C; 2024 Form 5500, Schedule C.

common law of trusts to define the general scope of their authority and responsibility." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985).

27. The duty of prudence is the "hallmark" of fiduciary activity. This is not a lay-person standard; it "requires expertise in a variety of areas." Dep't of Labor, *Meeting Your Fiduciary Responsibilities* (Sept. 2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

28. Fiduciaries have a "duty to exercise prudence in selecting investments" as well as a "continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). The "duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996).

29. The prudent investor rule recognizes that an investor's buying power and available alternatives change over time. A fiduciary "cannot ignore the power the trust wields to obtain favorable investment products." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (on remand).

30. In determining whether a fiduciary breached its duty of prudence, courts focus on process. *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356–58 (4th Cir. 2014) (prudence turns on whether the fiduciary "employed the appropriate methods to investigate the merits" and "engaged in a prudent decision-making process" (cleaned up)); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1069-70 (N.D. Cal. 2017).

31. Fiduciaries also have a duty to prudently select and monitor compensation paid to service providers. "[N]o more than reasonable compensation" may be paid for a party in interest's services, and a fiduciary must "consider the compensation received by the party 'from all sources.'" *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) (quoting Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed. Reg. at 5650).

32. Department of Labor guidance emphasizes the importance of prudently selecting service providers through an "objective process designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness

of the fees charged." U.S. Dep't of Labor, Information Letter to Theodore Konshak (Dec. 1, 1997), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/12-01-1997.

33. 29 U.S.C. § 1106(a)(1)(C) and 29 U.S.C. § 1108(b)(2) allow a fiduciary to enter into a service agreement with a party in interest only "if no more than reasonable compensation is paid therefor." The Lincoln entities are "parties in interest" under 29 U.S.C. § 1002(14).

34. Courts recognize the information asymmetry inherent in ERISA breach of fiduciary duty claims; *see Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer."). For this reason, "[t]he circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage." *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). Like fiduciaries, whose conduct is challenged, service providers also hold information inaccessible to plaintiffs. While the DOL's Section 408(b)(2) regulation[7] requires service providers to disclose fees to plan fiduciaries, plan participants receive no such disclosures.

35. Accordingly, "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–107 (2d Cir. 2021); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1022 (9th Cir. 2025) ("a plaintiff can plead a breach of the duty of prudence by alleging facts that would directly show that the fiduciaries employed unsound methods in making their investment decisions" or "circumstantial factual allegations from which the court may reasonably infer from what is alleged that the process was flawed." (quotation omitted)).

36. ERISA also imposes co-fiduciary liability. 29 U.S.C. § 1105(a) provides that a fiduciary is liable for a co-fiduciary's breach if the fiduciary: (1) participates knowingly in the

[7] *See* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/fact-sheet-service-provider-disclosure-regulation.pdf ("DOL 408(b)(2) Regulation Fact Sheet").

breach; (2) enables the breach by failing to comply with § 1104(a)(1); or (3) has knowledge of the breach and fails to make reasonable efforts to remedy it.

37. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under ERISA § 409, 29 U.S.C. § 1109. Section 409(a) provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## V. FACTUAL ALLEGATIONS

### A. The Plan's Bargaining Power

38. The Plan had both the bargaining power and the means to implement prudent processes to monitor the suitability of the Plan's investments and the Plan's recordkeeping fees. With an average of 3,530 participants and approximately $443 million in assets during the Class Period, the Plan is among the most attractive clients for any investment company or recordkeeper.

39. Defendants squandered that bargaining power. Instead of prudent stewardship, Defendants allowed the unsuitable and underperforming TRP Growth Stock Fund investment to reduce Plan participants' retirement funds by tens of millions of dollars and allowed Lincoln—which served as the Plan's trustee and recordkeeper—to set its own compensation with no meaningful oversight.

### B. Defendants Imprudently Retained the TRP Growth Stock Fund

40. The Plan Fiduciaries added TRP Growth Stock Fund to the Plan's investment lineup in 2019.

41. As of December 31, 2024, Plan participants had invested over $33M of their retirement savings in TRP Growth Stock Fund.

42. Throughout the Class Period, Class I has remained as the selected share class of the TRP Growth Stock Fund.

43. As described in detail below, the Defendants' failure to remove this unsuitable and underperforming investment from the Plan has caused the Plan Participants to suffer Losses between around $11 million and $31 million as set forth in the table below.[8]

**Approximate Performance Losses and Metrics January 1, 2020 to December 31, 2025**

| Investment Name | Total # of Metrics Analyzed | # of Metrics Underperformed | Percentage of Metrics Underperformed | Performance Losses ($) vs. Comparators |
|---|---|---|---|---|
| Alger Focus Equity Z | 72 | 71 | 99% | -$31,125,111 |
| Fidelity Blue Chip Growth K | 72 | 72 | 100% | -$24,720,790 |
| JPMorgan Growth Advantage R6 | 72 | 66 | 92% | -$15,894,905 |
| Putnam Large Cap Growth R6 | 72 | 69 | 96% | -$11,502,961 |
| Vanguard Russell 1000 Growth Index I | 36 | 36 | 100% | -$15,444,472 |
| **T. Rowe Price Growth Stock I Aggregate Summary** | **324** | **314** | **97%** | |

### i. Overview of Commonly Accepted Investment Theories

44. MPT stands for the proposition that prudent investors create portfolios to maximize the expected return generated by the portfolio for a given level of risk or minimize the level of risk for a given expected return.

45. As the Government Accountability Office stated in its June 2014 Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives, MPT "is a body of academic and empirical work that focuses on choosing a portfolio, not just its individual parts. Central components include: (1) the concept of diversification—the notion that with a well-chosen group of assets participants may be able to limit their losses and reduce fluctuations of investment returns without sacrificing too much potential gain, and (2) the concept of rebalancing—bringing a participant's portfolio back to an appropriate asset allocation mix—because over time some investments may become misaligned with the participant's investment goals. Rebalancing helps ensure that participant portfolios do not overemphasize one or more asset categories by returning the portfolio to a comfortable level of risk." GAO-14-310, p. 16, fn 31.

46. In other words, **it is a basic principle of MPT that the risks associated with an investment must be justified by its potential expected returns in order for that investment to**

8 Underlying data and methodologies used in this Complaint are set forth in the attached Appendix A.

**be rational.** This principle applies even before considering the purpose of the investment or the needs of an investor.

47. MPT is used to provide quantitative metrics to evaluate the performance of investment managers and to provide a rational analysis to determine whether certain investment managers are more likely to achieve a higher expected rate of return for a given amount of risk than others, i.e., outperform other investment managers, or outperform an applicable index.

48. As noted in the Appendix to the March 2024 United States Government Accountability Office Report to Congressional Requesters, some of the most important predictive risk-adjusted MPT metrics that are used to determine the prudence of an investment option include the following:[9]

- Alpha: "A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectation established by beta."
- Sharpe Ratio: "A risk-adjusted returns measure developed by William Sharpe. It is calculated over each [time] period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate."
- Sortino Ratio: "Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator."

49. Some additional MPT metrics used to evaluate the performance of investment managers, and the prudence of an investment option include, but are not limited to, the following:

[9] *See*, United States Government Accountability Office Report to Congressional Requesters, "401(k) Retirement Plans" March 2024, Accessible Version, page 70-71 of the Report (76-77 of the pdf).

- Information Ratio ("IR"): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.
- Batting Average ("BA"): is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A manager who beats the market half of the time would have a batting average of .500.

50. Ultimately, maximizing risk-adjusted performance is the primary and most important criteria from an MPT selection and retention perspective, while the actual performance, returns, of an investment is the most important criteria to the plan participant because returns dictate how much money the participant has available for retirement.

51. Accordingly, risk-adjusted performance and returns should always be considered by a fiduciary when evaluating an investment option.

52. When evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries requires the incorporation of standard metrics from MPT.

53. The Capital Asset Pricing Model[10] ("CAPM") is an investment theory that builds upon the general framework of MPT and is commonly used and accepted by investment experts.

54. The CAPM provides the following mathematical formula for the principle that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational:

---

[10] *See, e.g.*, https://corporatefinanceinstitute.com/resources/valuation/what-is-capm-formula/ (last viewed 5.22.26).

ERi = Rf + βi(Erm − Rf), where:

ERi = the expected return of the investment

Erm = the expected return of the market

Rf = the risk-free rate

βi = the beta of the investment

(Erm − Rf) = the market risk premium

55. Applied here, the beta—*βi*—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—*ERi*—is, at the very least, above that of its benchmark, *Rf*.[11]

56. Accordingly, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively managed investment attempts to beat) is somehow inappropriate or an "apples to oranges" comparison ignores the fundamental purpose and design of active mutual funds and is inconsistent with basic investment theory and the prevailing frameworks employed by prudent fiduciaries and advisors to retirement plans.

57. Prudent fiduciaries should—and *must*—compare actively managed funds to passively managed funds or similar indices in order to determine whether a plan is getting the additional return to justify the increased expense and risk of the active investment. This, in addition to other metrics, is exactly what every minimally competent investment professional does to evaluate an actively managed investment and arguments or suggestions to the contrary fall far outside mainstream thought in terms of investment management, basic economics, and minimum standards of fiduciary care and prudence.

58. Indeed, in promulgating its Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans in February, 2012, the DOL specifically required that plan sponsors identify benchmarks in the form of an appropriate broad-based

[11] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation. The APT, another investment analysis framework, likewise dictates the same result.

securities market index for each investment offered in the plan, thus specifically recognizing that actively managed investments must be evaluated against indexes, for which passively managed index funds serve as an investable proxy. Performing such a comparative analysis is not merely intended to determine whether a plan would be better served by a passively managed investment, but rather whether an actively managed fund is providing value sufficient to justify its retention.

59. This is not to suggest that active management is inappropriate for use in a retirement plan lineup. However, it confirms that plan fiduciaries as a preliminary matter must carefully analyze whether an actively managed fund provides value and, if they deem a fund does not provide increased value, they must promptly replace it with another fund that has demonstrated such capabilities or simply replace it with a fund tracking the index the fund is losing to.

60. An objective application of MPT metrics employed solely in the interest of plan participants is the best investment selection methodology currently available and is the approach that is commonly understood by prudent investment experts to be consistent with ERISA's fiduciary duty to provide retirement benefits to defined contribution plan participants (see more detailed discussion below).

**ii. Large-Cap Growth Funds**

61. Fiduciary duties and basic investment concepts apply to Large-Cap Growth funds as described.

62. Large-cap stocks are typically considered to be the top 70% of US equity market capitalization.[12] Large-Growth stocks are typically projected to grow faster than other large-cap stocks.

63. Large-Growth funds create portfolios primarily composed of large-cap growth stocks.

64. The typical aim of large-cap growth funds is to provide investors with long-term growth of capital through investments in primarily large capitalization stocks.

[12] See, e.g., Morningstar's Investing Terms and Definitions, https://www.morningstar.com/investing-terms/large-growth.

65. The principal categories of risk for growth stock funds include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

66. Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

67. Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (e.g., UnitedHealth Group) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

68. Investing in growth-oriented stocks also carries risk. In general, such stocks (e.g., Tesla) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., 3M Company).

**iii. T. Rowe Price Growth Stock Fund Class I**

69. The self-defined primary investment objective of TRP Growth Stock Fund is to "seek long-term growth of capital . . . by investing primarily in common stocks of well-established growth companies."[13]

70. The TRP Growth Stock Fund is an actively managed fund. In other words, it relies on the professional judgment of a portfolio management team to make decisions about the specific investments within the fund.

71. According to TRP, the TRP Growth Stock Fund typically invests at least 80% of its assets in stocks with growth characteristics. Specifically, "the fund generally seeks investments in stocks of large-cap companies with one or more of the following characteristics: strong cash flow and an above-average rate of earnings growth; the ability to sustain earnings momentum during

[13] *See, e.g.*, https://www.troweprice.com/financial-intermediary/us/en/investments/mutual-funds/us-products/growth-stock-fund.html (Fact Sheet, last visited May 12, 2026).

economic downturns; and occupation of a lucrative niche in the economy and the ability to expand even during time of slow economic growth."[14]

72. The TRP Growth Stock Fund is considered by Morningstar[15] to be in the "Large Growth" Category and Morningstar also considers the TRP Growth Stock Fund's Investment Style to be "Large Growth."[16]

73. As of December 31, 2025, TRP compared the performance of the TRP Growth Stock Fund to the performance of the Russell 1000 Growth Index[17] and in its Fact Sheet for the Growth Stock (Class I) compares the performance of the TRP Growth Stock Fund to the Russell 1000 Growth Index.

74. Accordingly, a potential reward of investing in the TRP Growth Stock Fund is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

**iv. TRP Growth Stock Fund Systemically and Substantially Underperformed Its Own Benchmark During the Class Period**

75. The methodologies employed by careful and prudent fiduciaries are designed to utilize MPT and CAPM to select a diversified menu of investment options that can be used to create a risk/reward profile that can meet the needs of any hypothetical plan participant. It can be rational and prudent to include riskier investments, but only if that risk carries with it a potential for a higher reward, i.e., an outsized return exceeding the return of a comparable risk-free (or lower-risk) option.

76. Index comparisons, as described above, are also particularly important in the efficient U.S. large cap space. Prudent fiduciaries are concerned with actively managed funds' ability to add value in excess of the benchmark, particularly with the domestic large cap strategies.

---

[14] *Id*.

[15] As noted by the United States Government Accountability Office, "Morningstar is a financial services firm that provides data on mutual funds, collective investment trusts, and other investments." GAO Report to Congressional Requesters, GAO-24-105364, p.2, fn2 (Accessible Version).

[16] See, https://www.morningstar.com/funds/xnas/prgfx/quote

[17] The Russell 1000 Growth Index is independently maintained by FTSE Russell 1000, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell 1000 is and has been a leading global provider of benchmarking, analytics, and data solutions for investors for over 20 years. The Russell 1000 Index measures the performance of the 1000 largest U.S. companies in the U.S. stock market. In contrast, the Russell 1000 *Growth Index* measures the performance of a subset of roughly half of the companies comprising the Russell 1000 Index that exhibit relatively more growth characteristics than the other half.

77. To that end, to measure the value added or subtracted by a portfolio manager, prudent fiduciaries and investment professionals scrutinize a fund's alpha, defined by Morningstar as a measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. This risk is the risk of the relevant market index. A positive alpha indicates that the portfolio has performed better than its beta would predict; a negative alpha indicates the fund has underperformed expectations based on the risk assumed. Said more simply, alpha represents the return on an investment that is not attributable to the movement of the market.

78. As described below, under MPT and CAPM incorporated into the standard of care and circumstances prevailing prior to and throughout the Class Period, the Vanguard Russell 1000 Growth Index Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.

79. These facts make the Russell 1000 Growth Index a meaningful comparator in the context of evaluating the prudence of TRP Growth Stock Fund under the circumstances prevailing prior to and throughout the Class Period.

80. T. Rowe Price's own published fund fact sheet for the TRP Growth Stock Fund lists the Russell 1000 Growth Index as its appropriate benchmark.

81. In addition, the Plan's IPS described the Russell 1000 as the benchmark for its Large Value and Large Growth holdings, which confirms that the Fiduciaries were aware that they should be comparing the TRP Growth Stock Fund's performance to that of the Russell 1000. *Id.* at 8.

82. These facts also make the Russell 1000 Growth Index the most appropriate index to use in the context of the calculation and evaluation of the investment performance metrics to determine whether any particular investment option, such as the TRP Growth Stock Fund, was a prudent investment under the circumstances prevailing prior to and throughout the Class Period.

83. The published fund fact sheets for the TRP Growth Stock Fund from Q3 2019 to Q4 2025 show that it underperformed 26 out of 26 quarters under 3-year returns against its index benchmark; 24 out of 26 quarters under 5-year returns against its index benchmark; 26 out of 26

quarters under 3-year Alpha Ratio; and 24 out of 26 quarters under 5-year Alpha Ratio. This would have tipped off any prudent fiduciary that this investment is not justifying its active management risk and thus would have removed it in favor of a peer fund that did not violate this basic investment concept or simply retained the benchmark instead.

84. Even more concerning, as illustrated in the chart below, starting in Q3 of 2019, the TRP Growth Stock Fund outperformed its benchmark only four times: in 5- year returns and Alpha Ratio, for Q1 and Q2 2021 *only*. Thus, starting Q3 of 2019 TRP Growth Stock Fund underperformed *26 out of 26 consecutive quarters* under 3-year returns against its index benchmark; *24 out of 26* quarters under 5-year returns against its index benchmark; *26 out of 26 quarters* under 3-year Alpha Ratio; and *24 out of 26 quarters* under 5-year Alpha Ratio. A prudent fiduciary reviewing TRP Growth Stock Fund's performance against its benchmark would not have sat idly by as it continued to fail to justify its additional risk against its index benchmark.

| T. Rowe Price Growth Stock I | | | | |
|---|---|---|---|---|
| | Return vs Benchmark | | Alpha | |
| | 3-Year | 5-Year | 3-Year | 5-Year |
| Q3 2019 | (0.42%) | (0.24%) | (0.28%) | (0.44%) |
| Q4 2019 | (0.27%) | (0.25%) | (0.37%) | (0.48%) |
| Q1 2020 | (1.23%) | (0.83%) | (1.22%) | (1.01%) |
| Q2 2020 | (2.41%) | (1.09%) | (2.20%) | (1.29%) |
| Q3 2020 | (2.67%) | (1.50%) | (2.22%) | (1.53%) |
| Q4 2020 | (1.80%) | (1.67%) | (1.42%) | (1.61%) |
| Q1 2021 | (2.11%) | 0.21% | (1.43%) | 0.33% |
| Q2 2021 | (1.92%) | 0.70% | (1.39%) | 0.71% |
| Q3 2021 | (1.05%) | (0.55%) | (0.74%) | (0.24%) |
| Q4 2021 | (4.85%) | (1.91%) | (3.42%) | (1.13%) |
| Q1 2022 | (7.07%) | (3.93%) | (5.87%) | (3.23%) |
| Q2 2022 | (8.22%) | (5.59%) | (7.79%) | (5.20%) |
| Q3 2022 | (7.07%) | (5.34%) | (6.69%) | (4.98%) |
| Q4 2022 | (8.20%) | (5.86%) | (7.87%) | (5.48%) |
| Q1 2023 | (8.22%) | (6.18%) | (7.61%) | (5.74%) |
| Q2 2023 | (7.54%) | (6.09%) | (7.07%) | (5.62%) |
| Q3 2023 | (6.40%) | (4.81%) | (6.10%) | (4.48%) |
| Q4 2023 | (7.29%) | (6.02%) | (6.90%) | (5.49%) |
| Q1 2024 | (7.85%) | (5.78%) | (7.36%) | (5.21%) |
| Q2 2024 | (8.28%) | (5.83%) | (7.77%) | (5.28%) |
| Q3 2024 | (8.09%) | (5.53%) | (7.59%) | (4.98%) |
| Q4 2024 | (6.28%) | (5.70%) | (5.97%) | (5.13%) |
| Q1 2025 | (3.69%) | (5.49%) | (3.48%) | (4.87%) |
| Q2 2025 | (2.30%) | (5.64%) | (1.81%) | (5.04%) |
| Q3 2025 | (3.21%) | (5.76%) | (2.22%) | (5.21%) |
| Q4 2025 | (1.38%) | (5.82%) | (0.70%) | (5.32%) |

85. Thus, even before the Class Period began, the TRP Growth Stock Fund had proven that it could not beat (or even match) its benchmark at even close to an acceptable rate—violating the basic investment principles that additional active management risk must be accompanied by an expectation of additional returns. Under the standards of a prudent fiduciary, it should have been removed from the Plan.

86. In fact, starting Q3 of 2021 TRP Growth Stock Fund never outperformed its benchmark again under 3- and 5-year returns and Alpha Ratio, thus Defendants' failure to remove it later into the Class Period and throughout the Class Period demonstrates a profound breakdown of the investment monitoring process.

87. In effect, the TRP Growth Stock Fund ultimately offered a *lower* return for a *higher* degree of risk—the precise opposite of what any prudent and careful fiduciary would seek.

88. Based on the information available to the Plan Fiduciaries with respect to TRP Growth Stock Fund performance against its index benchmark, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined that it violated bedrock investment principles and removed it at least by the middle of 2020, and/or all following consecutive quarters.

89. Any prudent fiduciary exercising prudent monitoring of its menu of investment options would have noticed that the TRP Growth Stock Fund's consistent underperformance was causing catastrophic damages to the Plan participants.

90. Fiduciaries following a prudent process in monitoring this investment would have recognized this and not have ignored TRP Growth Stock Fund's shortcomings against its applicable index benchmark.

91. TRP Growth Stock Fund's violation of a bedrock investment principle—that higher risks require a higher return—would have been cause to act for any prudent fiduciary.

92. Had the Fiduciaries engaged in appropriate monitoring, they would have placed this fund on watch well before the Class Period began and removed it by, at least, Q2 of 2020.

93. Fiduciaries applying a prudent process could not sit idly by as an investment continuously failed to beat its applicable index benchmark. The TRP Growth Stock Fund was simply not an appropriate option for the Plan.

94. Defendants' failure to notice or act upon the TRP Growth Stock Fund's underperformance of its own index benchmark alone is cause enough to infer imprudent process.

**v. Peer Comparison, Selection, Monitoring, and Replacement Process used by Prudent Fiduciaries**

95. Defendants similarly failed to notice, or act on, the TRP Growth Stock Fund's consistent underperformance relative to its peers.

96. The standard of care for plan fiduciaries selecting and monitoring investment options under the circumstances prevailing prior to and throughout the Class Period requires an evaluation of several commonly accepted MPT metrics which serve as indicators/predictors as to whether it is reasonable to assume that any particular investment is likely to achieve its goals prospectively and is a reasonable option compared to alternatives that appear to be more likely to achieve their goals.

97. Prudent fiduciaries scrutinize investment managers to determine whether an active manager has demonstrated an ability to succeed in their chosen sector of the market. To perform this analysis, and to distinguish between a skilled manager and a lucky one, fiduciaries judge fund performance against both an appropriate index benchmark and a universe of similar funds over periods most closely approximating a market cycle—typically three- and five-year intervals. These time-horizons are emphasized by virtually all prudent fiduciaries as the most important to gauge an investment manager's ability to execute their strategy. Accordingly, these two specific time horizons (three- and five-year trailing performance) are typically weighted more heavily than any other timeframes in connection with review of retirement fund investments.

98. Prudent fiduciaries utilize a careful, reasoned investment selection and monitoring process that considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential investment. Such an investment selection and monitoring process considers all the appropriate metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the investment should be selected, retained, or removed.

99. This process, when properly performed, involves a regular review of MPT investment performance metrics against a relevant index and peer group for the most recent

calendar quarter end over the previous three- and five-year periods in order to discern any pattern of underperformance. Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and/or rank above a threshold percentile (the top 50% at a minimum) among its peers across a broad range of MPT metrics, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.

100. While each different fiduciary may use a slightly different set of MPT metrics weighted slightly differently, there is a set of critical metrics that are relatively more predictive of the results. In other words, regardless of the specific combination of metrics used, if an investment option rates as inferior or imprudent when evaluated by the metrics set forth below, they frequently also rate as inferior or imprudent under any reasonably prudent combination of metrics and weightings.

101. Accordingly, a prudent plan fiduciary, when determining whether to retain a "Large Growth" Investment Option, would evaluate and compare the performance and commonly accepted investment performance metrics to meaningful benchmarks including peer alternatives/substitutes, such as the ones identified below, and the Russell 1000 Growth Index.

**vi. TRP Growth Stock Fund has Similar Aims, Risks, and Rewards as the Comparator Funds**

102. Like other large-cap growth funds, the TRP Growth Stock Fund's primary risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

103. The TRP Growth Stock Fund is not the only large-cap growth fund on the market with a substantially similar mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds / substitutes have existed prior to and throughout the Class Period. The TRP Growth Stock Fund dramatically and consistently underperformed its benchmark and several meaningful substitutes across a wide range of commonly and prudently utilized metrics.

104. Accordingly, all the investment options described below would be included in the peer consideration set for both benchmarking the TRP Growth Stock Fund as well as serving as potential replacements for the TRP Growth Stock Fund in the event it needed to be replaced.

105. Moreover, prudent fiduciaries would evaluate the performance of TRP Growth Stock Fund in comparison to the alternative comparable substitute investment options and benchmarks described below.

106. As a result, the following investment strategies/investment managers[18] are and have been both meaningful benchmarks as well as potential replacements for the TRP Growth Stock Fund prior to and throughout the Class Period. Similarly, the index listed below is and has been a meaningful benchmark to evaluate the performance of the investment managers of the TRP Growth Stock Fund prior to and throughout the Class Period:

a. Alger Focus Equity Z
b. Fidelity Blue Chip Growth K
c. JPMorgan Growth Advantage R6
d. Putnam Large Cap Growth R6
e. Vanguard Russell 1000 Growth Index I

107. Each of these comparable benchmarks and investable substitutes set forth above and below shares the same aims, risks, potential rewards, goals, and objectives and are categorized identically by Morningstar under the following portfolio criteria: 1) Morningstar Category Broad Group ("Equity"); 2) Morningstar Category Group ("Equity"); 3) Morningstar Category ("US Fund Large Growth"); 4) Morningstar Global Category ("US Equity Large Cap Growth"); 5) US Category Group ("U.S. Equity") 6) Morningstar Equity Style Box (Long) ("Large Growth"); 7) Morningstar Category Index ("Russell 1000 Growth TR USD"); 8) Morningstar Index ("Morningstar US LM Brd Growth TR USD"); 9) S&P Dow Jones Benchmark ("DJ US Total Stock Market Growth TR USD"); and 10) FTSE/Russell Benchmark ("Russell 1000 Growth TR USD").

108. Additionally, because the investment strategies and aims of each of the comparable benchmarks and investable substitutes set forth below are designed to focus on large growth stocks,

---

[18] Following the process utilized by prudent fiduciaries prior to and throughout the Class Period, any investment performance metric comparisons and other comparative metrics contained in this Complaint utilize the share class and/or trust that is the most appropriate for comparison in terms of fee rates, investment minimums, and track record (meaning the length of time for which the investment option has available data).

they are each required to share very similar asset allocations and, in fact, have had very similar asset allocations prior to and throughout the Class Period.

109. For example, as of April 30, 2026, each of these funds held more than 73% of their assets in companies that accounted for the top 70% (large stock) of the capitalization of United States stocks and the TRP Growth Stock Fund's allocation towards large stocks is the median among these comparable benchmarks and investable substitutes. Furthermore, the TRP Growth Stock Fund and all comparator peers invest the vast majority of their assets in the Giant and Large Cap category without diversifying into bonds or fixed income investments. As such their risks, aims, goals, and strategies are aligned and centered on Giant and Large Cap opportunities.

110. Prudent fiduciaries would have therefore included each of the comparable alternative substitute investment options when monitoring the TRP Growth Stock Fund and considered each of the investable substitutes identified above as potential replacements.

**a. Alger Focus Equity Z**

111. The Alger Focus Equity Fund Z ("Alger Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

112. Like the TRP Growth Stock Fund, the Alger Growth Fund is an actively managed large-cap growth fund.

113. The Alger Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Alger Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

114. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Alger Growth Fund and the TRP Growth Stock Fund.

115. The Alger Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

116. Like the TRP Growth Stock Fund, the principal risks of the Alger Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

117. The aims, risks, and potential rewards of the Alger Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

118. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant would consider the Alger Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

119. These facts make the Alger Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**b. Fidelity Blue Chip Growth K**

120. The Fidelity Blue Chip Growth Fund K ("Fidelity Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

121. Like the TRP Growth Stock Fund, the Fidelity Growth Fund is an actively managed large-cap growth fund.

122. The Fidelity Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Fidelity Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

123. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Fidelity Growth Fund and the TRP Growth Stock Fund.

124. The Fidelity Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

125. Like the TRP Growth Stock Fund, the principal risks of the Fidelity Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

126. The aims, risks, and potential rewards of the Fidelity Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

127. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant would consider the Fidelity Growth Fund as a

substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

128. These facts make the Fidelity Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**c. JPMorgan Growth Advantage R6**

129. The JPMorgan Growth Advantage Fund R6 ("JPM Growth Advantage Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

130. Like the TRP Growth Stock Fund, the JPM Growth Advantage Fund is an actively managed large-cap growth fund.

131. The JPM Growth Advantage Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the JPM Growth Advantage Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

132. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the JPM Growth Advantage Fund and the TRP Growth Stock Fund.

133. The JPM Growth Advantage Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

134. Like the TRP Growth Stock Fund, the principal risks of the JPM Growth Advantage Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

135. The aims, risks, and potential rewards of the JPM Growth Advantage Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

136. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant would consider the JPM Growth Advantage Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

137. These facts make the JPM Growth Advantage Fund a meaningful comparator to the TRP Growth Stock Fund.

**d. Putnam Large Cap Growth R6**

138. The Putnam Large Cap Growth Fund R6 ("Putnam Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

139. Like the TRP Growth Stock Fund, the Putnam Growth Fund is an actively managed large-cap growth fund.

140. The Putnam Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Putnam Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

141. Morningstar has identified the Russell 1000 Growth Index as the most appropriate category benchmark index for both the Putnam Growth Fund and the TRP Growth Stock Fund.

142. The Putnam Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

143. Like the TRP Growth Stock Fund, the principal risks of the Putnam Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

144. The aims, risks, and potential rewards of the Putnam Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

145. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary and/or Investment Consultant would consider the Putnam Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

146. These facts make the Putnam Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**e. Vanguard Russell 1000 Growth Index I**

147. The Vanguard Russell 1000 Growth Index Fund I ("Vanguard Growth Fund") is a passively managed index fund that seeks to track the performance of the Russell 1000 Growth

Index. The Vanguard Growth Fund tracks the Russell 1000 Growth Index by investing its assets in the large-cap growth stocks that make up the Russell 1000 Growth Index.

148. The Vanguard Growth Fund has similar aims, risks, and potential rewards as the TRP Growth Stock Fund because it tracks TRP Growth Stock Fund's index benchmark.

149. The Vanguard Growth Fund's potential reward is that it will generate investment returns in line with the Russell 1000 index.

150. Like the TRP Growth Stock Fund, the principal risks of the Vanguard Growth Fund are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

151. The aims, risks, and potential rewards of the Vanguard Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' aims, investment strategies, and the types and sizes of the stocks the two funds own.

152. As described above, under MPT and CAPM incorporated into the standard of care and circumstances prevailing prior to and throughout the Class Period, the Vanguard Russell 1000 Growth Index Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.

153. These facts make the Vanguard Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**vii. The TRP Growth Stock Fund Underperformed the Peer Comparators**

154. Poor investment performance can seriously diminish a participant's retirement savings. An investment option that underperforms by a mere half a percent annually has a material impact on a participant's retirement savings, particularly over the course of a multi-decade working career.

155. Under the circumstances prevailing prior to and throughout the Class Period fiduciaries following a prudent process selecting and monitoring large growth investment options made available to defined contribution plan participants would have evaluated the following commonly accepted MPT investment metrics which clearly demonstrated the TRP Growth Stock Fund should have been removed and replaced prior to the Class Period.

156. The TRP Growth Stock Fund's severe and consistent underperformance, illustrated in the tables below, raises a plausible inference that the TRP Growth Stock Fund could not have been determined to be prudent by any reasonably attentive fiduciaries during the Class Period.

157. Moreover, the TRP Growth Stock Fund's severe underperformance illustrated in the tables below raises a plausible inference that the TRP Growth Stock Fund could not have been expected to provide reasonable investment returns given the risk and therefore was not a prudent investment prior to and throughout the Class Period.

158. The following table illustrates the severe and consistent underperformance of the TRP Growth Stock Fund compared to meaningful comparable benchmarks and alternative options identified above based on widely used and commonly accepted MPT investment performance metrics.

159. Specifically, the table below provides a summary of 3- and 5-year investment returns and MPT investment manager performance metrics compared to the meaningful comparable investable alternatives/substitutes identified above throughout 2018 and 2019 and into the first quarter of 2020. Specifically, at year-end 2018 and 2019, the TRP Growth Stock Fund had underperformed 82% of a set of significant MPT investment manager metrics over 3- and 5-year periods.

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 10 | 10 | 100% |
| 5 - Year Return | 10 | 10 | 100% |
| Sharpe Ratio - 3 - Year | 10 | 9 | 90% |
| Sharpe Ratio - 5 - Year | 10 | 8 | 80% |
| Information Ratio 3 - Year | 8 | 8 | 100% |
| Information Ratio 5 - Year | 8 | 8 | 100% |
| Alpha 3 - Year | 8 | 7 | 88% |
| Alpha 5 - Year | 8 | 7 | 88% |
| Sortino Ratio - 3 - Year | 10 | 8 | 80% |
| Sortino Ratio - 5 - Year | 10 | 6 | 60% |
| Batting Average 3 - Year | 8 | 5 | 63% |
| Batting Average 5 - Year | 8 | 3 | 38% |
| **Total** | **108** | **89** | **82%** |

160. The table below shows the continuing severe underperformance of the MPT investment metrics of the TRP Growth Stock Fund compared to the meaningful comparable investable alternatives/substitutes/benchmarks identified above throughout the Class Period.

**Approximate Performance Losses and Metrics January 1, 2020 to December 31, 2025**

| Investment Name | Total # of Metrics Analyzed | # of Metrics Underperformed | Percentage of Metrics Underperformed | Performance Losses ($) vs. Comparators |
|---|---|---|---|---|
| Alger Focus Equity Z | 72 | 71 | 99% | -$31,125,111 |
| Fidelity Blue Chip Growth K | 72 | 72 | 100% | -$24,720,790 |
| JPMorgan Growth Advantage R6 | 72 | 66 | 92% | -$15,894,905 |
| Putnam Large Cap Growth R6 | 72 | 69 | 96% | -$11,502,961 |
| Vanguard Russell 1000 Growth Index I | 36 | 36 | 100% | -$15,444,472 |
| **T. Rowe Price Growth Stock I Aggregate Summary** | **324** | **314** | **97%** | |

161. The table below shows the severe underperformance in terms of the returns of the TRP Growth Stock Fund throughout Class Period compared to prudent alternatives and meaningful comparable benchmarks which approximately represents the losses suffered by plan participants as a direct result of the Plan fiduciaries' imprudent retention of the TRP Growth Stock Fund throughout the Class Period.

**Performance Metrics Comparison Summary January 2020 - December 2025**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 30 | 29 | 97% |
| 5 - Year Return | 30 | 30 | 100% |
| Sharpe Ratio - 3 - Year | 30 | 29 | 97% |
| Sharpe Ratio - 5 - Year | 30 | 30 | 100% |
| Information Ratio 3 - Year | 24 | 23 | 96% |
| Information Ratio 5 - Year | 24 | 24 | 100% |
| Alpha 3 - Year | 24 | 22 | 92% |
| Alpha 5 - Year | 24 | 24 | 100% |
| Sortino Ratio - 3 - Year | 30 | 28 | 93% |
| Sortino Ratio - 5 - Year | 30 | 30 | 100% |
| Batting Average 3 - Year | 24 | 21 | 88% |
| Batting Average 5 - Year | 24 | 24 | 100% |
| **Total** | **324** | **314** | **97%** |

162. In summary, Defendants retained the TRP Growth Stock Fund prior to and throughout the Class Period despite readily available information (available both prior to and

throughout the Class Period) which indicated dramatically inferior investment returns as well as dramatically inferior performance on MPT investment manager and risk adjusted metrics.

163. In other words, examining the information available to the Plan Fiduciaries in 2020, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined that its investment performance was inferior and its risk-adjusted performance was severely inferior under commonly accepted MPT investment metrics and thus removed the TRP Growth Stock Fund by early 2020, at the latest.

164. As a direct result of this conduct, the Plan participants have suffered investment losses of, at a minimum, tens of millions of dollars.

165. A prudent fiduciary would have in place a process of investigating and monitoring all plan funds, relative to their comparators and benchmarks, over a 3-year and 5-year period. A prudent fiduciary would put in place, and regularly carry out, a process in which consistently underperforming funds were removed from the list of investment options and replaced with prudent alternative/substitutes.

166. Any prudent fiduciary exercising reasonable and careful stewardship over the Plan, and its menu of investment options, would have noticed that the TRP Growth Stock Fund's consistent underperformance was causing catastrophic damages to the plan participants.

167. The Defendants either did not notice this ongoing underperformance or noticed but did not care. Either way, this continuing inaction is the result of an unreasonable and imprudent process and constitutes a breach of fiduciary duty which caused real and ongoing harm to Plaintiff and other plan participants.

168. In summary, Defendants' failure to have in place adequate processes to promptly remove and replace the TRP Growth Stock Fund from the Plan's investment menu caused the plan participants tens of millions of dollars in lost earnings over the Class Period.

**C. Defendants Failed to Monitor Excessive RKA Fees**

**i. RKA Services for Retirement Plans; Commoditization and Pricing**

169. The term "recordkeeping" is a catchall for the suite of administrative services typically provided to a defined contribution plan: maintaining participant accounts, processing transactions, and administering the plan in compliance with ERISA and the Internal Revenue Code. For large plans, these services are a commodity.

170. There are two categories of recordkeeping services. *First*, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services: (a) Basic account recordkeeping (*e.g.*, demographic, source, investment and vesting records); (b) Multi-channel participant and plan sponsor access (*e.g.*, phone, web); (c) Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges); (d) Payroll service (*e.g.*, hardships, in-service withdrawals, termination distributions); (e) Participant tax reporting services (*e.g.*, IRS Form 1099-R); (f) Participant confirmations, statements, and standard notices; (g) Plan-level reporting and annual financial package (excluding IRS Form 5500); (h) Participant education (*e.g.*, newsletters, web articles, standard communication materials); and (i) Plan consulting (*e.g.*, preapproved document services, operational materials).

171. *Second*, recordkeepers offer à la carte services such as loan processing and brokerage with separate per-transaction fees.

172. To the extent that recordkeepers offer certain services on an à la carte basis in addition to the bundled RKA services, any differences in the usage and fees for these à la carte services have an immaterial impact on the total RKA fees charged to large plans.

173. "It's no secret to retirement industry professionals and fiduciaries that recordkeeping services are fungible." Lauren K. Valastro, *How Misapplying Twombly Erodes Retirement Funds*, 32 Geo. Mason L. Rev. 421 (2025). Indeed, industry experts have long maintained that for large retirement plans, prudent fiduciaries should treat RKA services as a commodity when negotiating with recordkeepers. As one industry publication has explained:

"Custody and recordkeeping are 'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

174. The recordkeeping industry itself has also long recognized that RKA services for large plans are commoditized. On March 27, 2023, the National Association of Plan Advisors ("NAPA"), which describes itself as "the only advocacy group exclusively focused on the issues that matter to retirement plan advisors,"[19] surveyed its members and posed the question: "Is recordkeeping a commodity?"[20] The results, published on March 31, 2023, were unambiguous: 71% of all respondents agreed that the services provided by recordkeepers to retirement plans are commodities.[21] And of the subset of respondents who were themselves recordkeepers or third-party administrators, 65% agreed these services are commodities.

175. The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.[22] When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[23]

---

[19] About Us, NAPA-Net, https://www.napa-net.org/about/.

[20] Nevin E. Adams, Is Recordkeeping a "Commodity?", NAPA-Net (Mar. 27, 2023), https://www.napa-net.org/news/2023/3/recordkeeping-commodity/

[21] Nevin E. Adams, J.D., READER RADAR: Service (Still) Separates Recordkeepers, NAPA-Net (Mar. 30, 2023), https://www.napa-net.org/news/2023/3/reader-radar-service-still-separates-recordkeepers/.

[22] *See* Study of 401(k) Plan Fees and Expenses, Economic Systems, Inc. (submitted to U.S. Department of Labor, Pension and Welfare Benefits Administration, Apr. 13, 1998), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

[23] *See* Mercer, *Defined Contribution Plan Fee Practices* (2024), https://www.mercer.com/assets/us/en_us/shared-

176. Recordkeepers compete on price, not on the substance of the core services they provide, because those core services are materially identical across providers. And because the RKA offerings provided by recordkeepers are materially identical commodities, it is the standard and prevailing practice for retirement plan fiduciaries and advisors to request quotes by asking what the recordkeeper's revenue requirement is on a per-participant basis for providing the bundled RKA services.

177. For this reason, prudent plan fiduciaries following the standard of care treat the services provided by recordkeepers as a commodity when ensuring that they pay only reasonable fees for those services. This approach achieves the best results for the exclusive benefit of plan participants as required by ERISA, because it enables objective, apples-to-apples comparisons of recordkeeping pricing across providers and eliminates the ability of an incumbent recordkeeper to justify excessive fees by claiming illusory service differentiation.

178. Because, for all practical purposes, RKA services are treated as a commodity by prudent plan fiduciaries, fee comparisons are used by prudent plan fiduciaries to understand the range of RKA fees paid in the market.

179. For example, prior to and throughout the class period some of the largest and well-known retirement plan advisors such as CapTrust, RPAG, and NEPC conduct benchmarking analyses and RFP exercises as standard fiduciary practices to determine whether plan sponsors are paying reasonable recordkeeping fees.

180. In summary, comparisons of the total RKA fees paid by similarly sized plans are meaningful and probative of the reasonableness of any particular plan's fees.

**ii. The Standard of Care for Monitoring RKA Fees**

181. ERISA's duty of prudence does not end when a fiduciary selects a service provider; it imposes a *continuing* obligation to monitor the plan's investments and service arrangements and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022). On remand, the Seventh Circuit made clear that "fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids,

---

assets/local/attachments/pdf-dc-plan-fee-practices.pdf.

consolidating recordkeepers, negotiating for rebates—may violate their duty of prudence." *Hughes v. Northwestern*, 63 F.4th 615, 625–26 (7th Cir. 2023).

182. The duty to monitor fees applies not only at the point of initial selection but at regular intervals thereafter. A recordkeeper's fees that were reasonable when the plan first engaged the provider may become excessive over time as the plan's assets grow, as new market entrants drive down pricing, or as technology reduces the cost of providing services. Accordingly, fiduciaries must reassess the reasonableness of recordkeeping compensation on an ongoing basis, and the failure to do so supports a claim for breach of the duty of prudence. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *see also Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (affirming district court's ruling that the defendants "breached their fiduciary duties by failing to monitor and control recordkeeping fees").

183. The standard of care requires not only benchmarking but also conducting a competitive RFP for recordkeeping services every three to five years. Leading retirement plan advisory firms, including CAPTRUST, RPAG, and NEPC, treat periodic competitive bidding as a baseline fiduciary obligation, recommending "a more formal recordkeeper search and selection process conducted approximately every three to five years" regardless of whether the plan sponsor is satisfied with its existing provider. *See* CAPTRUST, *Evaluating Retirement Plan Fees* (2024), https://www.captrust.com/resources/retirement-plan-fees-part-1/.

184. Consistent with these principles, Mercer's best practices guidance for defined contribution plan governance recommends that fiduciaries: (a) price administrative fees on a per-participant basis, so that fees are transparent and do not silently increase as plan assets grow; (b) benchmark and negotiate recordkeeping fees separately from investment management fees; (c) benchmark fees at least every other year; and (d) review services annually to identify opportunities to reduce costs. *See* Mercer, *Defined Contribution Plan Plan Fee Practices* (2024), https://www.mercer.com/en-us/insights/retirement/defined-contribution-plans/defined-contribution-plan-fee-practices/.

185. As set forth below, Defendants failed to adhere to the standard of care in every material respect. The consequence of these failures is that Plan participants paid recordkeeping fees that were, in every year of the Class Period, multiples of the fees paid by similarly sized plans.

The Plan's Recordkeeping Arrangement with Lincoln and Excessive Fees

186. At all relevant times, Lincoln served as the Plan's recordkeeper, providing the full suite of bundled services described above. The services Lincoln provided are not materially different from those it provides to other large defined contribution plan clients or the services that other recordkeepers provided to similar plans.

187. Lincoln's RKA fees are set forth in Table 6:

**Table 6: The Plan's RKA Fees**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | *Average* |
|---|---|---|---|---|---|---|---|
| **Participants** | 3,479 | 3,463 | 3,428 | 3,694 | 3,530 | 3,587 | ***3,530*** |
| **Est. RKA Fees** | $550,945 | $424,109 | $585,871 | $690,870 | $668,918 | $759,866 | ***$613,430*** |
| **Est. RKA Per Participant** | $158 | $122 | $171 | $187 | $189 | $212 | ***$173*** |

188. In direct fees alone, Lincoln collected more than $3.6 million from the Plan between 2019 and 2024. Lincoln also received indirect compensation.

189. The Plan's $173 average per-participant fee is excessive by any measure. For example, the 2024 NEPC DC Fee Report identifies that 75% of plans with 1,000-5,000 participants paid less than $70 per participant.[24] The Plan's $212 fee in 2024, at nearly three times that amount, is off of the chart. Similar plans paid a fraction of the Plan's fees.

190. Comparing the Plan's fees to similarly situated plans confirms the Plan overpaid:

**Table 7: The Plan's RKA Fees vs. Peer Plan RKA Fees**

| Plan Name | Participants | Direct RKA Fees | RKA Fees Per Participant | Recordkeeper |
|---|---|---|---|---|
| Plan Year 2020 | | | | |
| Guardian Cooperative Investment Plan | 3,023 | $200,131 | $66 | Fidelity |
| The Western Union Company Incentive Savings Plan | 3,018 | $176,154 | $58 | Schwab |
| Esco Employee Savings Investment Plan | 3,184 | $184,929 | $58 | Vanguard |

[24] NEPC, 2024 NEPC DC Plan Trends & Fee Report (March 2025), https://www.nepc.com/wp-content/uploads/2025/02/2024-NEPC-DC-Plan-Trends-and-Fees-Report.pdf.

| | | | | |
|---|---|---|---|---|
| Endo Pharmaceuticals Savings and Investment Plan | 3,939 | $235,444 | $60 | Schwab |
| Evoqua Water Technologies LLC Savings Plan | 3,940 | $212,843 | $54 | Schwab |
| **NorthBay Healthcare 403(b) Retirement Plan** | **3,463** | **$424,109** | **$122** | **Lincoln** |
| Plan Year 2021 | | | | |
| Guardian Cooperative Investment Plan | 2,946 | $192,391 | $65 | Fidelity |
| The Western Union Company Incentive Savings Plan | 2,966 | $171,944 | $58 | Schwab |
| Esco Employee Savings Investment Plan | 3,301 | $201,840 | $61 | Vanguard |
| Endo Pharmaceuticals Savings and Investment Plan | 3,836 | $235,678 | $61 | Schwab |
| Evoqua Water Technologies LLC Savings Plan | 4,000 | $225,631 | $56 | Schwab |
| **NorthBay Healthcare 403(b) Retirement Plan** | **3,428** | **$585,871** | **$171** | **Lincoln** |
| Plan Year 2022 | | | | |
| Guardian Cooperative Investment Plan | 2,922 | $161,390 | $55 | Fidelity |
| The Western Union Company Incentive Savings Plan | 2,711 | $160,367 | $59 | Schwab |
| Esco Employee Savings Investment Plan | 3,403 | $188,900 | $56 | Vanguard |
| Endo Pharmaceuticals Savings and Investment Plan | 3,521 | $217,063 | $62 | Schwab |
| Evoqua Water Technologies LLC Savings Plan | 4,506 | $249,907 | $55 | |
| **NorthBay Healthcare 403(b) Retirement Plan** | **3,694** | **$690,870** | **$187** | **Lincoln** |
| Plan Year 2023 | | | | |
| Guardian Cooperative Investment Plan | 2,966 | $153,949 | $52 | Fidelity |
| The Western Union Company Incentive Savings Plan | 2,754 | $147,880 | $54 | Schwab |
| Esco Employee Savings Investment Plan | 3,605 | $168,628 | $47 | Vanguard |
| Endo Pharmaceuticals Savings and Investment Plan | 3,281 | $200,138 | $61 | Schwab |
| **NorthBay Healthcare 403(b) Retirement Plan** | **3,530** | **$668,918** | **$189** | **Lincoln** |
| Plan Year 2024 | | | | |
| Guardian Cooperative Investment Plan | 3,164 | $115,903 | $37 | Fidelity |
| The Western Union Company Incentive Savings Plan | 2,743 | $143,501 | $52 | Schwab |
| Esco Employee Savings Investment Plan | 3,726 | $188,987 | $51 | Vanguard |
| Endo Pharmaceuticals Savings and Investment Plan | 3,112 | $188,476 | $61 | Schwab |
| **NorthBay Healthcare 403(b) Retirement Plan** | **3,587** | **$758,866** | **$212** | **Lincoln** |

191. These comparator plans—with similar participant counts—received materially identical recordkeeping services and paid a fraction of what the Plan paid. The Plan's $189 per-

participant fee in 2023 was 3.5 times the comparator average of $54. By 2024, the gap widened: the Plan's $212 was 4.2 times the comparator average of $50. Overall, the Plan's $173 per participant average fee from 2020 to 2024 is 209% greater than the average fee of $56 per participant for the same period.

192. This disparity alone supports an inference of imprudence. *See Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 189–90 (3d Cir. 2024) (fee differential of 3.7 times a reasonable fee sufficient to state a claim); *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *4 (3d Cir. July 24, 2024) (2 times industry average supported a plausible claim).

193. Given the size of the Plan during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

194. The Plan should have been able to obtain per-participant recordkeeping fees of no more than $60 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

195. Using a reasonable benchmark of $60 per participant—consistent with the comparator evidence and industry surveys—the Plan overpaid for recordkeeping in every year of the Class Period. Accounting for the time value of the excess fees, participants suffered cumulative compounded losses of more than $2.3 million.

**Table 8: RKA Fees Cumulative Losses**

| | **2020** | **2021** | **2022** | **2023** | **2024** |
|---|---|---|---|---|---|
| **Participants** | 3,463 | 3,428 | 3,694 | 3,530 | 3,587 |
| **Est. RKA Fees** | $424,109 | $585,871 | $690,870 | $668,918 | $759,866 |
| **Est. RKA Per Participant** | $122 | $171 | $187 | $189 | $212 |
| **Reliable Est. of Reasonable RKA Fees** | $207,780 | $205,680 | $221,640 | $211,800 | $215,220 |
| **Reliable Est. of Reasonable RKA Fees Per Participant** | $60 | $60 | $60 | $60 | $60 |
| **Est. Conservative RKA Losses** | $216,329 | $380,191 | $469,230 | $457,118 | $544,646 |
| **Est. RKA Losses Per Participant** | $62 | $111 | $127 | $129 | $152 |
| **Compounding Percentage** | | 13.38% | -14.46% | 14.56% | 11.43% |
| **Est. RKA Compounded Losses** | **$216,329** | **$625,472** | **$1,004,254** | **$1,607,627** | **$2,335,962** |

196. Had Defendants performed prudent monitoring, RFI, and RFP processes, the Plan would not have paid these excess fees and participants' accounts would not have suffered these losses.

197. Throughout the Class Period, the Plan's RKA fees trended upward—the opposite of what occurs when fiduciaries monitor fees and leverage a plan's growing size. This pattern reflects systematic failure to conduct the review and analysis necessary to satisfy fiduciary duties.

## VI. CLASS ACTION ALLEGATIONS

198. Plaintiff brings this action on behalf of Plaintiff and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants and their immediate family members.

199. The Class Period includes the six years prior to the date of the filing of this Complaint through the date of judgment.

200. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are suitable to common resolution.

201. Plaintiff's claims are typical of the claims of other members of the Class because her claims arise from the same events, practices and/or courses of conduct described above.

202. Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

203. Plaintiff will fairly and adequately represent and protect the interests of the Class.

204. Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

205. Defendants have no unique defenses against Plaintiff that would interfere with Plaintiff's representation of the Class.

206. Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty.

207. The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

208. The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

209. The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants breached their fiduciary duties, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly from the declaratory or injunctive relief or flow as a necessary consequence of that relief.

210. The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over

any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies and damages will likewise predominate over any individual issues.

211. A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

212. Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII. PLAN-WIDE RELIEF

213. ERISA authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). See 29 U.S.C. § 1132(a)(2).

214. Indeed, ERISA breach-of-fiduciary duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176-77 (2022).

215. Plaintiff here seeks relief on behalf of the Plan, *i.e.*, in this case for all losses to the Plan caused by Defendants' breaches, and not only the losses to Plaintiff's individual account.

## VIII. TIMELINESS

216. Within the six-year period prior to Plaintiff's filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

217. Plaintiff did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

**COUNT I**
**Breach of the Duty of Prudence**
***(Against Defendants)***

218. Plaintiff incorporates each allegation above as if fully set forth herein.

219. At all relevant times, Defendants were fiduciaries of the Plan under 29 U.S.C. §§ 1002(21)(A) and/or 1102(a)(1).

220. At all relevant times, the Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). Each of these Defendants (i) exercised authority and control with respect to the management of the Plan and its assets; (ii) rendered investment advice for a fee or other compensation, direct or indirect, with respect to Plan assets, or had the authority or responsibility to do so; and (iii) had discretionary authority or discretionary responsibility in the administration of the Plan.

221. Pursuant to 29 U.S.C. § 1104(a)(1), (B), the Defendants were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

222. The Defendants are and were responsible for investigating, evaluating, and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure that plan assets were invested prudently.

223. The Defendants failed to discharge their duties under ERISA § 404(a)(1)(A) and (B); 29 U.S.C. § 1104(a)(1)(A) and (B). They were obligated to discharge their duties to the Plan and participants with the care, skill, prudence, and diligence of a competent investment fiduciary charged with the responsibility for investing millions of dollars of retirement savings on behalf of thousands of investors. The Committee and its individual members breached their fiduciary duties

through an imprudent process for investigating, evaluating, and monitoring the Plan's investment options.

224. Common law and ERISA's duty of prudence further required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 575 U.S. at 529.

225. Defendants failed to act prudently in the best interest of the Plan and participants and breached their fiduciary duties by: (i) failing to prudently monitor and remove the underperforming TRP Growth Stock Fund; and (ii) failing to monitor and control excessive recordkeeping and administrative fees.

226. Defendants are and were responsible for investigating, evaluating, and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure that plan assets were invested prudently.

227. Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring the Plan's investment options.

228. A reasonably prudent fiduciary, following a reasonably prudent process, would have removed and not retained the TRP Growth Stock Fund from the Plan's set of investment options.

229. By failing to remove the T. Rowe Price Growth Stock Fund from the Plan's set of investment options, and replacing it with one of the several available comparator funds, the Committee and its individual members therefore failed to discharge their duties with the care, skill, diligence and prudence required by ERISA.

230. These breaches have caused substantial damage to the Plan, for which Defendants are jointly and severally liable.

231. Defendants knowingly participated in the breach of the other, knowing that such acts were a breach, enabled other fiduciaries to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and failed to make any

reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

232. Defendants likewise failed to act prudently and defray the Plan's recordkeeping expenses as required and further failed to incur only appropriate and reasonable administrative expenses. As a result, the Plan's recordkeeping expenses were excessive, resulting in losses to the Plan's participants.

233. Defendants knowingly participated in each fiduciary breach of the Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the Plan's fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

234. Defendants are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, and for such other equitable or remedial relief the Court deems appropriate. Total losses to the Plan will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been available to the Plan's participants to date. As a direct and proximate result of these breaches, the Plan, Plaintiff, and Class members suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced and are entitled to be made whole for their losses.

## COUNT II
## Failure to Adequately Monitor Other Fiduciaries
***(Against NorthBay Healthcare and the Committee)***

235. Plaintiff incorporates each allegation above as if fully set forth herein.

236. A fiduciary that appoints other fiduciaries to manage a plan retains a "continuing duty to monitor" those appointees and to ensure they are adequately performing their fiduciary obligations. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *see also Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022) ("[I]f the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty."). This duty exists "separate and apart from the

[fiduciary's] duty to exercise prudence in selecting investments at the outset." *Tibble*, 575 U.S. at 529. Where an appointing fiduciary delegates investment selection or monitoring to a committee or external adviser, the appointing fiduciary retains an independent duty to monitor the delegate. ERISA § 405(a), 29 U.S.C. § 1105(a).

237. NorthBay Healthcare, as Plan Sponsor and Administrator, had the authority to appoint and remove members of the Committee, and to select the Plan's Trustee, Recordkeeper, and Investment Manager. IPS at 2. NorthBay Healthcare exercised this authority by, among other things, appointing the Committee members and engaging SageView as the Plan's ERISA § 3(38) Investment Manager. NorthBay Healthcare accordingly had a duty to monitor the Committee to ensure it was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

238. The Committee, in turn, elected to delegate its investment duties to SageView while retaining responsibility "for the oversight and evaluation of the Investment Manager." IPS at 2. The Committee accordingly had a duty to monitor SageView to ensure SageView was prudently exercising the discretionary fiduciary authority it held under ERISA § 3(38) over the Plan's investment selection process—including the selection, monitoring, and retention of investments, including the TRP Growth Stock Fund.

239. NorthBay Healthcare and the Committee also had a duty to ensure that their respective appointees possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; and reported regularly regarding their stewardship of Plan assets.

240. NorthBay Healthcare breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate whether the Committee was conducting product-specific reviews of the TRP Growth Stock Fund, and standing idly by as the Committee permitted the Plan to remain invested in the TRP Growth Stock Fund even as it consistently underperformed its benchmark and meaningful comparator peers; (b) failing to ascertain whether the Committee was fulfilling its IPS obligation to oversee and evaluate SageView's performance as the Plan's § 3(38) Investment Manager; and (c) failing to ensure that the Committee or any other fiduciary was

monitoring the reasonableness of Lincoln's total compensation—including recordkeeping and administrative fees—for the services Lincoln provided to the Plan.

241. The Committee breached its fiduciary monitoring duties by, among other things: (a) failing to oversee and evaluate whether SageView, as the Plan's § 3(38) Investment Manager with discretionary fiduciary authority over investment selection, was fulfilling its independent obligation to evaluate the prudence of maintaining the TRP Growth Stock Fund as the Plan's largest growth fund investment; and (b) failing to take corrective action upon learning—or upon the circumstances that should have put a prudent fiduciary on notice—that SageView was not conducting any evaluation of the TRP Growth Stock Fund.

242. The Committee's and SageView's inaction was a red flag to NorthBay Healthcare that these fiduciaries were not fulfilling their duties. The Plan's IPS uses only suggestive language regarding Plan investment alternative monitoring, stating that such investments "*should* be reviewed *at least annually* against [the investment's] peer group and benchmark index to assess the performance and quality of each offering"—suggesting no mandatory protocol existed and no monitoring was being conducted as TRP Growth Stock Fund continued to underperform its benchmark and peer group year after year. *Id.* at 4.

243. As a direct and proximate result of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had NorthBay Healthcare and the Committee complied with their fiduciary monitoring obligations, they would have discovered that the Plan's fiduciaries were failing to monitor the TRP Growth Stock Fund and would have taken corrective action, including directing its replacement with a prudent alternative.

244. Pursuant to ERISA §§ 409(a) and 502(a)(2); 29 U.S.C. §§ 1109(a) and 1132(a)(2), NorthBay Healthcare and the Committee are liable to restore to the Plan all losses caused by their failure to adequately monitor the Plan's fiduciaries, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of the Plan and proposed Class members, respectfully requests that the Court:

a) Determine that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and appoint Plaintiff as the Class Representative;

b) Find and declare that the Defendants breached their fiduciary duties as described above;

c) Find and adjudge that the Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties alleged herein, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty as alleged herein;

d) Determine the method by which the Plan's losses under 29 U.S.C. § 1109(a) should be calculated;

e) Order all Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

f) Impose a constructive trust over these profits;

g) Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

h) Order the Defendants to provide an accounting necessary to determine the amounts that Defendants must make good to the Plan under § 1109(a);

i) Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

j) Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

k) Award to Plaintiff and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

l) Order the payment of prejudgment and post-judgment interest to the extent allowed by law; and

m) Grant other equitable or remedial relief as the Court deems appropriate.

DATED: August 4, 2026

Respectfully submitted,

*/s/ John J. Nelson*
John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive, Penthouse
Beverly Hills, CA 90212
Tel.: (858) 209-6941
jnelson@milberg.com

Alexandr Rudenco*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and the Prospective Class*